1  KELLY A. JOHNSON
   Acting Assistant Attorney General
2  Environment and Natural Resources Division
   U.S. Department Of Justice
3  ROBERT D. MULLANEY
   Trial Attorney
4  California State Bar No. 116441
   Environmental Enforcement Section
5  U.S. Department of Justice
   301 Howard Street, Suite 1050
6  San Francisco, CA 94105
   Tel: (415) 744-6491
7  Fax: (415) 744-6476
   E-mail: Robert.Mullaney@usdoj.gov
8
   DEBRA WONG YANG
9  United States Attorney
   Central District of California
10 LEON W. WEIDMAN
   Chief, Civil Division
11 ROBYN-MARIE LYON MONTELEONE
   Assistant United States Attorney
12 California State Bar No. 130005
   Room 7516, Federal Building
13 300 North Los Angeles Street
   Los Angeles, CA 90012
14 Tel: (213) 894-2458
   Fax: (213) 894-8782
15 E-mail: Robby.Monteleone@usdoj.gov

16 Attorneys for Plaintiff United States of America

FILED
CLERK, U.S. DISTRICT COURT

DEC 13 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                         DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

20 | UNITED STATES OF AMERICA     )   CV05-7514 AHM (CTx)
21 |                              )
   |            Plaintiff,        )   Civil No.
22 |                              )
   |       v.                     )
23 |                              )   CONSENT DECREE
   |                              )
24 | SEVEN-UP/RC BOTTLING         )
   | COMPANY OF SOUTHERN          )
25 | CALIFORNIA, INC.,            )
   |                              )
26 |            Defendant.        )
   |_____)
27
28

DOCKETED ON CM

DEC 15 2005

BY                    003

# TABLE OF CONTENTS

I. JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

II. APPLICABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

III. DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-

IV. CIVIL PENALTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

V. COMPLIANCE REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

VI. REPORTING REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

VII. STIPULATED PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

VIII. FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

IX. DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

X. INFORMATION COLLECTION AND RETENTION . . . . . . . . . . . . . . -18-

XI. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS . . . . . . . . . -20-

XII. COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

XIII. NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

1

XIV.  EFFECTIVE DATE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

2

3  XV.  RETENTION OF JURISDICTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

4

5  XVI.  MODIFICATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

6

7  XVII.  TERMINATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

8

9  XVIII.  PUBLIC PARTICIPATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-

10

11  XIX.  SIGNATORIES/SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-

12

13  XX.  INTEGRATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

14

15  XXI.  FINAL JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

16

17  XXII.  APPENDIX  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

18

19

20

21

22

23

24

25

26

27

28

1    Concurrently with the lodging of this Consent Decree, Plaintiff
2 United States of America, on behalf of the United States Environmental Protection
3 Agency ("EPA"), has filed a Complaint in this action pursuant to Section 309 of
4 the Clean Water Act (the "Act"), 33 U.S.C. § 1319, alleging that Defendant Seven-
5 Up/RC Bottling Company of Southern California, Inc. ("Defendant" or "Seven-
6 Up") violated the Act at its soft drink bottling facility in Vernon, California (the
7 "Vernon Facility"), and at its soft drink bottling facility in Buena Park, California
8 (the "Buena Park Facility").

9    The Complaint alleges that Defendant: (i) discharged, without a
10 permit, pollutants, including industrial wastes and storm water associated with
11 industrial activity, from the Vernon Facility and the Buena Park Facility into
12 waters of the United States; (ii) violated the terms and conditions of the State
13 Water Resources Control Board's General Permit for Discharges of Storm Water
14 Associated with Industrial Activities Excluding Construction Activities ("General
15 Permit") at its Vernon Facility and Buena Park Facility; and (iii) violated federal
16 pretreatment requirements by discharging low pH wastewater from the Buena Park
17 Facility to the Orange County Sanitation District sewer system.

18    The Parties recognize, and the Court by entering this Consent Decree
19 finds, that this Consent Decree has been negotiated by the Parties in good faith and
20 will avoid litigation between the Parties, and that this Consent Decree is fair,
21 reasonable, and in the public interest.

22    NOW, THEREFORE, before the taking of any testimony, without the
23 adjudication or admission of any issue of fact or law except as provided in Section
24 I below, and with the consent of the Parties, IT IS HEREBY ADJUDGED,
25 ORDERED, AND DECREED as follows:

26            I. JURISDICTION AND VENUE

27    1.    This Court has jurisdiction over the subject matter of this action,
28 pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 309(b) of the Act, 33

-1-

1   U.S.C. § 1319(b), and over the Parties.  Venue lies in this District pursuant to 33

2   U.S.C. § 1319(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the

3   violations alleged in the Complaint occurred in, and Defendant conducts business

4   in, this judicial District.  For purposes of this Decree, or any action to enforce this

5   Decree, Defendant consents to the Court's jurisdiction over this Decree or such

6   action and over Defendant, and consents to venue in this judicial District.

7       2.     For purposes of this Consent Decree, Defendant agrees that the

8   Complaint states claims upon which relief may be granted pursuant to Section

9   309(b) of the Act.

10      3.     Notice of the commencement of this action has been given to the

11  State of California, as required by Section 309(b) of the Act.

12                       II.  APPLICABILITY

13      4.     The obligations of this Consent Decree apply to and are binding upon

14  the United States, and upon Defendant and any successors, assigns, or other

15  entities or persons otherwise bound by law.

16      5.     Any transfer of ownership or operation of the Facilities to any other

17  person must be conditioned upon the transferee's agreement:  (i) to subject itself to

18  the jurisdiction of this Court as the defendant in this Consent Decree; and (ii) to

19  perform all remaining obligations of Seven-Up required by this Decree, as

20  provided in a written agreement between Seven-Up and the proposed transferee,

21  enforceable by the United States as a third-party beneficiary of such agreement.

22  At least 30 days prior to such transfer, Seven-Up shall provide a copy of this

23  Consent Decree to the proposed transferee.  At least 15 days prior to such transfer,

24  Seven-Up shall provide written notice of the prospective transfer, together with a

25  copy of the proposed written agreement, to EPA and the United States, in

26  accordance with Section XIII (Notices) of this Decree.  If Seven-Up attempts to

27  transfer ownership or operation of the Facilities without complying with this

28  Paragraph, it shall constitute a violation of this Decree.  Seven-Up shall remain

1  obligated to ensure that the terms of the Decree are implemented until:  (1) Seven-

2  Up has paid the civil penalty as required by Section IV (Civil Penalty); (2) with

3  respect to operations by Seven-Up prior to transfer of ownership or operation of

4  the Facility, Seven-Up has either paid any accrued stipulated penalties owed to the

5  United States pursuant to Section VII (Stipulated Penalties) or any disputes

6  relating to stipulated penalties have been resolved pursuant to Section IX (Dispute

7  Resolution); and (3) the transferee is substituted by the Court as a defendant under

8  this Decree.

9      6.    Defendant shall provide a copy of this Consent Decree to all officers,

10  employees, and agents whose duties include compliance with any provision of this

11  Decree, as well as to any contractor retained to perform work required under this

12  Consent Decree.  Defendant shall condition any such contract upon performance

13  of the work in conformity with the terms of this Consent Decree.

14      7.    In any action to enforce this Consent Decree, Defendant shall not

15  raise as a defense the failure by any of its officers, directors, employees, agents, or

16  contractors to take any actions necessary to comply with the provisions of this

17  Consent Decree.

18                    III. DEFINITIONS

19      8.    Terms used in this Consent Decree that are defined in the Act or in

20  regulations promulgated pursuant to the Act shall have the meanings assigned to

21  them in the Act or such regulations, unless otherwise provided in this Decree.

22  Whenever the terms set forth below are used in this Consent Decree, the following

23  definitions shall apply:

24          a.    "Buena Park Facility" shall mean Defendant's soft drink

25  bottling facility in Buena Park, California.

26          b.    "Complaint" shall mean the Complaint filed by the United

27  States in this action;

28          c.    "Consent Decree" or "Decree" shall mean this Decree;

1    d.    "Day" shall mean a calendar day unless expressly stated to be a
2  working day.  In computing any period of time under this Consent Decree, where
3  the last day would fall on a Saturday, Sunday, or federal holiday, the period shall
4  run until the close of business of the next working day;

5    e.    "Defendant" shall mean Seven-Up/RC Bottling Company of
6  Southern California, Inc.;

7    f.    "EPA" shall mean the United States Environmental Protection
8  Agency and any of its successor departments or agencies;

9    g.    "Facilities" shall mean Defendant's Buena Park Facility and
10  Vernon Facility;

11    h.    "Paragraph" shall mean a portion of this Decree identified by
12  an Arabic numeral;

13    i.    "Parties" shall mean the United States and Defendant;

14    j.    "Section" shall mean a portion of this Decree identified by a
15  Roman numeral;

16    k.    "Settling Defendants" shall mean Seven-Up and its directors,
17  officers, and employees, acting in their capacities as such.

18    l.    "United States" shall mean the United States of America, acting
19  on behalf of EPA.

20    m.    "Vernon Facility" shall mean Defendant's soft drink bottling
21  facility in Vernon, California.

22                        IV. CIVIL PENALTY

23    9.    Within 30 days after the Effective Date of this Consent Decree,
24  Defendant shall pay the sum of $428,250 as a civil penalty, together with interest
25  accruing from the date on which the Consent Decree is lodged with the Court, at
26  the rate specified in 28 U.S.C. § 1961 as of the date of lodging.  Payment shall be
27  made by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of
28  Justice in accordance with instructions to be provided to Defendant, following

1   lodging of the Consent Decree, by the Financial Litigation Unit of the U.S.

2   Attorney's Office for the Central District of California. At the time of payment,

3   Defendant shall simultaneously send written notice of payment and a copy of any

4   transmittal documentation (which should reference DOJ case number 90-5-1-1-

5   08191 and the civil action number of this case) to the United States in accordance

6   with Section XIII (Notices) of this Decree.

7       10.    Defendant shall not deduct the civil penalty of $428,250, together

8   with accrued interest thereon, paid under this Section in calculating its federal

9   income tax.

10                  V. <u>COMPLIANCE REQUIREMENTS</u>

11      11.    <u>Designation of Clean Water Act Compliance Director</u>. Within 90

12   days after the Effective Date, Seven-Up shall designate an environmental

13   Compliance Director at the corporate level whose primary responsibility shall be

14   Seven-Up's corporate-wide compliance with the Act. The Compliance Director

15   shall have appropriate professional qualifications and shall directly report to

16   Seven-Up's Chief Executive Officer. The Compliance Director shall have

17   oversight authority and responsibility for Seven-Up's compliance with the Act,

18   including, but not limited to, timely application for and renewal of any applicable

19   National Pollutant Discharge Elimination System ("NPDES") permit for storm

20   water discharges associated with Seven-Up's industrial activities at the Facilities,

21   implementation and updates of Storm Water Pollution Prevention Plans

22   ("SWPPP") and Best Management Practices ("BMP") as required by the

23   applicable NPDES permit, and implementation of pretreatment compliance

24   measures at the Facilities. Within 105 days after the Entry Date, Seven-Up shall

25   provide notice to EPA in accordance with Section XIII (Notices) of this Consent

26   Decree, listing the individual's name, professional qualifications, address,

27   telephone and fax numbers, and e-mail address. If Seven-Up replaces the

28   Compliance Director, Seven-Up shall, within 15 days after the replacement,

1  provide notice to EPA in accordance with Section XIII (Notices) of this Consent
2  Decree, listing the individual's name, professional qualifications, address,
3  telephone and fax numbers, and e-mail address.

4      12.  <u>Vernon Facility BMP Plan</u>.  Within 45 days after the Effective Date,
5  Seven-Up shall submit to EPA and the Los Angeles County Sanitation District
6  ("District") for approval a BMP Plan, together with a schedule for completion of
7  tasks, for the design and implementation of structural BMPs to prevent the back
8  alley wastewater drain at the Vernon Facility from overflowing to any storm drain
9  or waters of the United States.  EPA or the District may require Seven-Up to make
10  modifications to the BMP Plan.  Unless otherwise specified by EPA or the
11  District, Seven-Up shall, within 45 days of receipt of comments from EPA and the
12  District, incorporate the modifications into the BMP Plan.  After EPA and the
13  District have approved the BMP Plan, Seven-Up shall implement the Plan in
14  accordance with the approved schedule.

15      13.  <u>Buena Park Facility pH Compliance Plan</u>.

16      a.  Seven-Up's discharges from the Buena Park Facility to the
17  Publicly Owned Treatment Works ("POTW") shall comply with the pH limit of
18  5.0.  Compliance shall be determined by the instantaneous result of a single grab
19  sample, as may be taken using a continuous pH monitoring device.  In order to
20  achieve compliance with the pH limit of 5.0, Seven-Up shall implement the pH
21  Compliance Plan, which is attached as Appendix A to this Consent Decree, in
22  accordance with the following schedule:  (i) complete construction, installation,
23  and start-up of a new pH treatment system and submit a notice of completion to
24  EPA no later than November 30, 2005; (ii) begin implementation of the training
25  component and submit the materials prepared for the training component to EPA
26  no later than December 15, 2005; and (iii) begin implementation of the monitoring
27  component no later than December 15, 2005.

28      b.  Beginning on February 15, 2006, and continuing until February

1   15, 2008, Seven-Up shall submit to EPA, as part of the quarterly report submitted

2   pursuant to Paragraph 17(a) of this Consent Decree:  (i) the Monthly Wastewater

3   Treatment System Review sheets required under the monitoring component of the

4   pH Compliance Plan; (ii) a daily tabulation of pH sample results for the

5   wastewater effluent during the reporting period that fall within each of the

6   following pH ranges:  4.9 to 4.0, 3.9 to 3.0, 2.9 to 2.0, and 1.9 and below,

7   including a separate category for those sample results covered by Paragraph

8   13.b.(iii)(b) below; (iii) for any pH value below 5.0 listed in the daily tabulations,

9   provide:  (a) the relevant sampling data; (b) if Seven-Up claims that the pH value

10  did not reflect the actual pH value of the effluent at the time the sample was taken

11  due to documented mechanical/operational errors (e.g., probe failure) that directly

12  affected the validity of the particular sample, a description of the evidence of the

13  specific mechanical or operational error and all supporting documents; and (c) a

14  description of the corrective action taken and an assessment of its effectiveness;

15  and (iv) a log summarizing the training provided and listing the personnel trained

16  during the reporting period, along with any updated training materials.

17          c.  Seven-Up shall retain all continuous pH monitoring data and

18  documents generated as part of the monitoring and training components of the pH

19  Compliance Plan on site until the termination of this Consent Decree pursuant to

20  Section XVII, and shall make them available for inspection by EPA and other

21  regulatory agencies.

22          d.  Beginning on February 15, 2006, and continuing until February

23  15, 2008, any discharge to the POTW with a pH lower than 5.0 shall be subject to

24  Stipulated Penalties pursuant to Paragraph 24 of this Consent Decree; provided,

25  however, to the extent that Seven-Up properly and adequately documented its

26  claim under Paragraph 13.b.(iii)(b) that a pH value under 5.0 did not reflect the

27  actual pH value of the effluent at the time the sample was taken due to

28  documented mechanical/operational errors that directly affected the validity of the

1   particular sample, Seven-Up may raise that claim as an affirmative defense to a

2   demand for Stipulated Penalties.

3        14.   <u>Facilities Inspection and Response Program</u>.  Beginning 30 days after

4   the Effective Date until February 15, 2008, Seven-Up shall implement a Facility

5   Inspection and Response Program for the Facilities to:  (a) inspect the outdoor

6   industrial areas at the Vernon Facility and Buena Park Facility on a daily basis

7   when the respective Facility is operating to assess the effectiveness of BMPs and

8   SWPPPs and ensure compliance with the General Permit; (b)  respond

9   immediately to any problems or deficiencies noted during inspection; and

10   (c) maintain an inspection log documenting the inspection and any required

11   response.  The inspection log shall be maintained on site at each Facility until the

12   termination of this Consent Decree pursuant to Section XVII and shall be

13   available for inspection.  The inspection log shall include the following

14   information:  (i) the date and time of the inspection; (ii) the person conducting the

15   inspection; (iii) a check list of areas inspected; (iv) observation of any industrial

16   activity or pollution source, including any spill or leakage, that may lead to the

17   storm water collection system or contribute to a non-storm water discharge; (v) the

18   person notified of any observations made pursuant to subparagraph (iv); and

19   (vi) any control measures taken to address the observations made pursuant to

20   subparagraph (iv) and the person performing the control measures.  Within 45

21   days after the Effective Date, Seven-Up shall submit a copy of the Facility

22   Inspection and Response Program to EPA in accordance with Section XIII

23   (Notices) of this Consent Decree.  In the quarterly report submitted to EPA

24   pursuant to Paragraph 17, Seven-Up shall include a separate section to identify

25   any problems or deficiencies observed during inspections, any control measures

26   taken, and the timing of any responses.

27        15.   <u>Non-storm Water Discharges at the Facilities</u>.  Except as allowed by

28   the Act, the General Permit or a separate individual NPDES permit, any non-storm

water discharges by Defendant, or its employees, agents, or contractors, from either the Vernon Facility or the Buena Park Facility, either directly or indirectly into waters of the United States, is prohibited.  Beginning on the Effective Date and continuing until February 15, 2008, any non-storm water discharge in violation of this Paragraph shall be subject to Stipulated Penalties pursuant to Paragraph 25 of this Consent Decree.

16.    <u>Permits</u>.  When any compliance obligation under this Section requires Defendant to obtain a federal, state, or local permit or approval, Defendant shall submit timely applications and timely provide additional information as requested by the permitting authority to make its applications complete, and take all other actions necessary to obtain all such permits or approvals.  Defendant may seek relief under the provisions of Section VIII (Force Majeure) of this Consent Decree for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendant has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

## VI. <u>REPORTING REQUIREMENTS</u>

17.    Defendant shall submit the following reports:

a.    Within 30 days after the end of each calendar-year quarter (*i.e.*, by April 30, July 30, October 30, and January 30) after the Effective Date until termination of this Decree pursuant to Section XVII, Defendant shall submit to EPA a quarterly report for the preceding quarter that shall include the status of any construction or compliance measures (e.g., permitting process, anticipated start-up of operation, testing, etc.); completion of milestones; problems encountered or anticipated, together with implemented or proposed solutions; status of permit applications; information required to be submitted to EPA pursuant to Paragraphs 13 and 14 of this Consent Decree; all monitoring results

generated by the Facilities regarding storm water discharges; and reports to state and local authorities.

b.      Defendant shall notify the United States in writing, within ten working days of the day Defendant first becomes aware of a violation or a potential violation of any requirement of this Consent Decree, and shall identify its likely duration, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully explained at the time the report is due, Defendant shall so state in the report. Defendant shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 days of the day Defendant becomes aware of the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves Defendant of its obligation to provide the notice required by Section VIII (Force Majeure) of this Consent Decree.

18.      All reports shall be submitted to the persons designated in Section XIII (Notices) of this Consent Decree.

19.      Each report submitted by Defendant under this Section shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of law that I have examined and am familiar with the information submitted in this document and all attachments and that this document and its attachments were prepared either by me personally or under my direction or supervision in a manner designed to ensure that qualified and knowledgeable personnel properly gather and present the information contained therein. I further certify, based on my personal knowledge or on my inquiry of those individuals immediately responsible for obtaining the information, that the information is true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment for knowingly and willfully submitting a materially false statement.

This certification requirement does not apply to emergency or similar notifications

-10-

where compliance would be impractical.

20.    The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the Act or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

21.    Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## VII. STIPULATED PENALTIES

22.    If Defendant fails to pay the civil penalty required to be paid under Section IV (Civil Penalty) of this Decree when due, Defendant shall pay a Stipulated Penalty of $5,000 per day for each day that the payment is late.  Late payment of the civil penalty shall be made in accordance with Section IV, Paragraph 9, above.  Stipulated Penalties shall be paid in accordance with Section VII, Paragraph 32, below.  All transmittal correspondence shall state that any such payment is for late payment of the civil penalty due under this Decree, or for Stipulated Penalties for late payment, as applicable, and shall include the identifying information set forth in Paragraph 9, above.

23.    Defendant shall be liable for Stipulated Penalties to the United States for violations of this Consent Decree as specified below, unless excused under Section VIII (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

24.    Discharge Limit.  The following Stipulated Penalties shall accrue per violation per day for each violation of the pH limit specified in Paragraph 13 that occurs within a 24-hour period beginning at 12:00 a.m.:

| pH Range | Penalty per Violation per Day |
|----------|-------------------------------|
| 4.9 - 4.0 | $1,000 |
| 3.9 - 3.0 | $2,000 |
| 2.9 - 2.0 | $5,000 |
| 1.9 and below | $7,500 |

If Seven-Up's sampling indicates multiple violations of the pH limit on a single day, Seven-Up shall be subject to one Stipulated Penalty for that day based on the most serious of the violations.[1]/

25.   Non-storm Water Discharges.  The following Stipulated Penalties shall accrue per violation per day for each non-storm water discharge in violation of Paragraph 15 from either the Vernon Facility or the Buena Park Facility to waters of the United States:

| Penalty Per Violation Per Day | Period of Noncompliance |
|-------------------------------|-------------------------|
| $5,000 | 1st through 3rd day |
| $10,000 | 4th through 7th day |
| $15,000 | 8th day and beyond |

26.   Compliance Milestones.

a.   The following Stipulated Penalties shall accrue per violation per day for each violation of the requirements identified in Subparagraph b:

| Penalty Per Violation Per Day | Period of Noncompliance |
|-------------------------------|-------------------------|
| $1,000 | 1st through 14th day |
| $3,500 | 15th through 30th day |
| $10,000 | 31st day and beyond |

b.   The applicable compliance requirements are as follows:

---

[1]/ For example, if monitoring for a Thursday indicated a pH of 4.9 at 11 a.m. and a pH of 2.9 at 4 p.m., a Stipulated Penalty of $5,000 would apply for that Thursday.

-12-

| Requirement | Paragraph |
|---|---|
| Designation of Compliance Director | 11 |
| BMP Plan Compliance Schedule Milestones | 12 |
| pH Compliance Plan Schedule Milestones | 13 |
| Failure to Conduct Inspections | 14 |
| Failure to Respond to Observed Deficiencies | 14 |

27.   Reporting, Monitoring, and Recordkeeping Requirements.  The following Stipulated Penalties shall accrue per violation per day for each violation of the reporting, monitoring, and recordkeeping requirements of Sections V and VI of this Consent Decree:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 30th day |
| $750 | 31st day and beyond |

28.   For Defendant's failure to comply with Paragraph 5 or Paragraph 48 through 51 of this Consent Decree:

| Penalty per Violation per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 14th day |
| $1,000 | 15th through 30th day |
| $2,000 | 31st day and beyond |

29.   Stipulated Penalties under this Section shall begin to accrue on the day after performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated Penalties shall accrue simultaneously for separate violations of this Consent Decree.  Defendant shall pay any Stipulated Penalty within 30 days of receiving the United States' written demand.

30.   The United States may, in the unreviewable exercise of its discretion, reduce or waive Stipulated Penalties otherwise due it under this Consent Decree.

31.     Stipulated Penalties shall continue to accrue as provided in Paragraph 29, above, during any Dispute Resolution, with interest on accrued penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid until the following:

a.     If the dispute is resolved by agreement or by a decision of EPA that is not appealed to the Court, Defendant shall pay accrued penalties agreed upon or determined to be owing, together with interest, to the United States within 30 days of the effective date of the agreement or the receipt of EPA's decision or order.

b.     If the dispute is appealed to the Court and the United States prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

c.     If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing by the appellate court, together with interest, within 15 days of receiving the final appellate court decision.

32.     Defendant shall, as directed by the United States in its demand, pay Stipulated Penalties owing to the United States by EFT in accordance with Section IV, Paragraph 9, above or by certified or cashier's check in the amount due, payable to the "U.S. Department of Justice," referencing DOJ No. 90-5-1-1-08191, and delivered to:

> United States Attorney's Office
> Central District of California
> Attn: Financial Litigation Unit
> 300 North Los Angeles Street
> Los Angeles, CA 90012

33.     Defendant shall not deduct Stipulated Penalties paid under this Section in calculating its federal income tax.

34.     If Defendant fails to pay Stipulated Penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.

35.     Subject to the provisions of Section XI (Effect of Settlement/ Reservation of Rights) of this Consent Decree, the Stipulated Penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States for Defendant's violation of this Consent Decree or applicable law.  Where a violation of this Consent Decree is also a violation of the Act, Defendant shall be allowed a credit, for any Stipulated Penalties paid, against any statutory penalties imposed for such violation.

## VIII.  FORCE MAJEURE

36.     A "Force Majeure Event" is any event beyond the control of Defendant, its contractors, or any entity controlled by Defendant that delays the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation.  "Best efforts" includes anticipating any potential force majeure event and addressing the effects of any such event (a) as it is occurring and (b) after it has occurred, to prevent or minimize any resulting delay to the greatest extent possible.  "Force Majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

37.     Defendant shall provide notice orally or by electronic or facsimile transmission to the United States as soon as possible, but not later than 72 hours after the time Defendant first knew of, or by the exercise of due diligence, should have known of, a claimed Force Majeure Event.  Defendant shall also provide written notice to the United States, as provided in Section XIII (Notices) of this Consent Decree, within seven days of the time Defendant first knew of, or by the exercise of due diligence, should have known of, the event.  The notice shall state the anticipated duration of any delay; its cause(s); Defendant's past and proposed

1   actions to prevent or minimize any delay; a schedule for carrying out those
2   actions; and Defendant's rationale for attributing any delay to a Force Majeure
3   Event.  Failure to provide oral and written notice as required by this Paragraph
4   shall preclude Defendant from asserting any claim of force majeure, unless such
5   failure was due to a Force Majeure Event.

6       38.    If the United States agrees that a Force Majeure Event has occurred,
7   the United States may agree to extend the time for Defendant to perform the
8   affected requirements for the time necessary to complete those obligations.  An
9   extension of time to perform the obligations affected by a Force Majeure Event
10  shall not, by itself, extend the time to perform any other obligation.  Where the
11  United States agrees to an extension of time, the appropriate modification shall be
12  made pursuant to Section XVI (Modification) of this Consent Decree.

13      39.    If the United States does not agree that a Force Majeure Event has
14  occurred, or does not agree to the extension of time sought by Defendant, the
15  United States' position shall be binding, unless Defendant invokes Dispute
16  Resolution under Section IX of this Consent Decree.  In any such dispute,
17  Defendant bears the burden of proving, by a preponderance of the evidence, that
18  each claimed Force Majeure Event is a Force Majeure Event, that Defendant gave
19  the notice required by Paragraph 37, that the Force Majeure Event caused any
20  delay Defendant claims was attributable to that event, and that Defendant
21  exercised best efforts to prevent or minimize any delay caused by the event.

22              IX.  DISPUTE RESOLUTION

23      40.    Unless otherwise expressly provided for in this Consent Decree, the
24  dispute resolution procedures of this Section shall be the exclusive mechanism to
25  resolve disputes arising under or with respect to this Consent Decree.  Defendant's
26  failure to seek resolution of a dispute under this Section shall preclude Defendant
27  from raising any such issue as a defense to an action by the United States to
28  enforce any obligation of Defendant arising under this Decree.

41.    <u>Informal Dispute Resolution</u>.  Any dispute subject to dispute resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when the United States receives a written Notice of Dispute from Defendant.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed 20 days from the date the United States receives the Notice of Dispute, unless that period is modified by written agreement.  If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 20 days after receiving written notice from the United States terminating informal negotia-tions, Defendant invokes formal dispute resolution procedures as set forth below.

42.    <u>Formal Dispute Resolution</u>.  Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but may not necessarily be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

43.    The United States shall serve its Statement of Position within 30 days of receipt of Defendant's Statement of Position.  The United States' Statement of Position shall include, but may not necessarily be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.  The United States' Statement of Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

44.    Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XIII (Notices) of this Consent Decree, a motion requesting judicial resolution of the dispute.  The motion must be filed within 10 days of receipt of the United States' Statement of

Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

45.   The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court.  Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

46.   In any dispute brought under Paragraph 44, Defendant shall bear the burden of demonstrating that its position clearly complies with this Consent Decree and the Act and that Defendant is entitled to relief under applicable law.  The United States reserves the right to argue that its position is reviewable only on the administrative record and must be upheld unless arbitrary and capricious or otherwise not in accordance with law.

47.   The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated Penalties with respect to the disputed matter shall continue to accrue from the first day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 31, above.  If Defendant does not prevail on the disputed issue, Stipulated Penalties shall be assessed and paid as provided in Section VII (Stipulated Penalties).

## X. INFORMATION COLLECTION AND RETENTION

48.   The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into Defendant's Facilities, at all reasonable times, upon presentation of credentials, to:

    a.    monitor the progress of activities required under this Consent Decree;

    b.    verify any data or information submitted to the United States in

1    accordance with the terms of this Consent Decree;

2    c.    obtain samples and, upon request, splits of any samples taken by

3         Defendant or its representatives, contractors, or consultants;

4    d.    obtain documentary evidence, including photographs and similar

5         data; and

6    e.    assess Defendant's compliance with this Consent Decree.

7    49.    Upon request, Defendant shall provide EPA or its authorized

8    representatives splits of any samples taken by Defendant. Upon request, EPA

9    shall provide Defendant splits of any samples taken by EPA.

10    50.    Until the termination of this Consent Decree pursuant to Section

11    XVII, Defendant shall retain, and shall instruct its contractors and agents to

12    preserve, copies of all documents, records, or other information (including docu-

13    ments, records, or other information in electronic form) in its or its contractors' or

14    agents' possession or control, or that come into its or its contractors' or agents'

15    possession, and that relate to Defendant's performance of its obligations under this

16    Consent Decree. This information-retention requirement shall apply regardless of

17    any contrary corporate or institutional policies or procedures. At any time during

18    this information-retention period, the United States may request copies of any

19    documents, records, or other information required to be maintained under this

20    Paragraph.

21    51.    At the conclusion of the information-retention period provided in the

22    preceding Paragraph (i.e., upon the termination of this Consent Decree),

23    Defendant shall notify the United States at least 90 days prior to the destruction of

24    any documents, records, or other information subject to the requirements of the

25    preceding Paragraph, and, upon request by the United States, Defendant shall

26    deliver any such documents, records, or other information to EPA. Defendant may

27    assert that certain documents, records, or other information are privileged under

28    the attorney-client privilege or any other privilege recognized by federal law. If

-19-

Defendant asserts such a privilege, it shall provide the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of each author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by Defendant. However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

52.    Defendant may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that Defendant seeks to protect as CBI, Defendant shall follow the procedures set forth in 40 C.F.R. Part 2.

53.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

XI. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

54.    This Consent Decree resolves the civil claims of the United States against the Settling Defendants for the violations alleged in the Complaint filed in this action through the date of lodging.

55.    The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 54. This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal laws, regulations, or permit conditions, except as expressly specified in Paragraph 54. The United States further reserves all legal and equitable remedies to address any imminent and

-20-

1  substantial endangerment to the public health or welfare or the environment

2  arising at, or posed by, Defendant's Facilities, whether related to the violations

3  addressed in this Consent Decree or otherwise.

4      56.    This Consent Decree is not a permit, or a modification of any permit,

5  under any federal, State, or local laws or regulations.  Defendant is responsible for

6  achieving and maintaining compliance with all applicable federal, State, and local

7  laws, regulations, and permits; and Defendant's compliance with this Consent

8  Decree shall be no defense to any action commenced pursuant to any such laws,

9  regulations, or permits.  The United States does not, by its consent to the entry of

10  this Consent Decree, warrant or aver in any manner that Defendant's compliance

11  with any aspect of this Consent Decree will result in compliance with provisions

12  of the Act, 33 U.S.C. §§ 1251 - 1387, or with any other provisions of federal,

13  State, or local laws, regulations, or permits.

14     57.    This Consent Decree does not limit or affect the rights of Defendant

15  or of the United States against any third party, not a party to this Consent Decree,

16  nor does it limit the rights of any third party, not a party to this Consent Decree,

17  against Defendant, except as otherwise provided by law.

18     58.    This Consent Decree shall not be construed to create rights in, or

19  grant any cause of action to, any third party not a party to this Consent Decree.

20                          XII.  COSTS

21     59.    The Parties shall bear their own costs of this action, including

22  attorneys' fees, except that the United States shall be entitled to collect the costs

23  (including attorneys' fees) incurred in any action necessary to collect any portion

24  of the civil penalty or any Stipulated Penalties due but not paid by Defendant.

25                          XIII.  NOTICES

26     60.    Unless otherwise specified herein, whenever notifications,

27  submissions, or communications are required by this Consent Decree, they shall be

28  made in writing and shall be sent by certified mail, express mail, or similar

overnight mail delivery with return receipt requested and addressed as follows:

To the United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Box 7611 Ben Franklin Station
Washington, D.C. 20044-7611
Re: DOJ No. 90-5-1-1-08191

and

Chief, Environmental Enforcement Section
Attn: DOJ # 90-5-1-1-08191(Mullaney)
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105

and

Jessica Kao, ORC-2
U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street
San Francisco, California 94105

To EPA:

Director, Water Division (WTR-1)
U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street
San Francisco, California 94105
Attention: Amy Miller

To Defendant:

President
Seven-Up/RC Bottling Company of Southern California, Inc.
3220 E. 26th Street
Vernon, California 90023

With a Copy to:

William M. Nelson
Senior Vice President and General Counsel
Dr. Pepper/Seven-Up Bottling Group, Inc.
5950 Sherry Lane, Suite 500
Dallas, Texas 75225

61. Any Party may, by written notice to the other Party, change its designated notice recipient or notice address provided above.

62. Notices submitted pursuant to this Section shall be deemed submitted

1  upon mailing, unless otherwise provided in this Consent Decree or by mutual
2  agreement of the Parties in writing.

### XIV. EFFECTIVE DATE

4  63.  The Effective Date of this Consent Decree shall be the date upon
5  which this Consent Decree is entered by the Court.

### XV. RETENTION OF JURISDICTION

7  64.  The Court shall retain jurisdiction over this case until termination of
8  this Consent Decree, for the purpose of resolving disputes arising under this
9  Decree or entering orders modifying this Decree, pursuant to Sections IX and
10  XVI, or effectuating or enforcing compliance with the terms of this Decree.

### XVI. MODIFICATION

12  65.  The terms of this Consent Decree may be modified only by a
13  subsequent written agreement signed by the Parties. Where the modification
14  constitutes a material change to any term of this Decree, it shall be effective only
15  upon approval by the Court.

### XVII. TERMINATION

17  66.  After Defendant has complied with all requirements relating to
18  Paragraphs 5 (if applicable), and 11 through 15 of this Consent Decree, and has
19  paid the civil penalty and any accrued Stipulated Penalties as required by this
20  Consent Decree, Defendant may serve upon the United States a Request for
21  Termination, stating that Defendant has satisfied those requirements, together with
22  all necessary supporting documentation.

23  67.  Following receipt by the United States of Defendant's Request for
24  Termination, the Parties shall confer informally concerning the Request and any
25  disagreement that the Parties may have as to whether Defendant has satisfactorily
26  complied with the requirements for termination of this Consent Decree. If the
27  United States agrees that the Decree may be terminated, the Parties shall submit,
28  for the Court's approval, a joint stipulation terminating the Decree.

1  68.  If the United States does not agree that the Decree may be terminated,
2  Defendant may invoke Dispute Resolution under Section IX of this Decree.
3  However, Defendant shall not seek Dispute Resolution of any dispute regarding
4  termination, under Paragraph 42 of Section IX, until 60 days after service of its
5  Request for Termination.

6  XVIII. PUBLIC PARTICIPATION

7  69.  This Consent Decree shall be lodged with the Court for a period of
8  not less than 30 days for public notice and comment in accordance with 28 C.F.R.
9  § 50.7. The United States reserves the right to withdraw or withhold its consent if
10  the comments regarding the Consent Decree disclose facts or considerations
11  indicating that the Consent Decree is inappropriate, improper, or inadequate.
12  Defendant consents to entry of this Consent Decree without further notice.

13  XIX. SIGNATORIES/SERVICE

14  70.  Each undersigned representative of Defendant and the Assistant
15  Attorney General for the Environment and Natural Resources Division of the
16  Department of Justice or her delegate certifies that he or she is fully authorized to
17  enter into the terms and conditions of this Consent Decree and to execute and
18  legally bind the Party he or she represents to this document.

19  71.  This Consent Decree may be signed in counterparts, and its validity
20  shall not be challenged on that basis.

21  72.  Defendant agrees not to oppose entry of this Consent Decree by the
22  Court or to challenge any provision of the Decree, unless the United States has
23  notified Defendant in writing that it no longer supports entry of the Decree.

24  73.  Defendant agrees to accept service of process by mail with respect to
25  all matters arising under or relating to this Consent Decree and to waive the formal
26  service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil
27  Procedure and any applicable Local Rules of this Court including, but not limited
28  to, service of a summons.

-24-

## XX.  INTEGRATION

74.  This Consent Decree constitutes the final, complete, and exclusive agreement and understanding between the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  No other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XXI.  FINAL JUDGMENT

75.  Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and Defendant.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XXII.  APPENDIX

76.  The following Appendix is attached to and incorporated into this Consent Decree:

"Appendix A" is the pH Compliance Plan for the Buena Park Facility.


**ORDER**

IT IS SO ORDERED:

_____
United States District Judge

Dated:  12/13/05

-25-

1  FOR PLAINTIFF UNITED STATES OF AMERICA:

2                                        KELLY A. JOHNSON
                                         Acting Assistant Attorney General
3                                        Environment and Natural Resources
                                          Division
4                                        Washington, D.C.  20530

5

6  Date: _10 - 3- 05_          By:  _____

7                                        W. BENJAMIN FISHEROW
                                         Deputy Chief
8                                        Environmental Enforcement Section
                                         Environment and Natural Resources
9                                          Division
                                         U.S. Department of Justice
10

11

12  Dated: _10 - 14 - 05_            _____

13                                        ROBERT D. MULLANEY
                                         Trial Attorney
14                                        Environmental Enforcement Section
                                         U.S. Department of Justice
15                                        301 Howard Street, Suite 1050
                                         San Francisco, California  94105
16                                        Telephone:  (415) 744-6491

17

18

19

20

21

22

23

24

25

26

27

28

-26-

1

2   Dated: *Sept. 27, 2005*                     *Nancy J. Marvel for*

3                                           GRANTA Y. NAKAYAMA
                                            Assistant Administrator
4                                           Office of Enforcement and Compliance
                                            Assurance
5                                           U.S. Environmental Protection Agency
                                            1200 Pennsylvania Avenue
6                                           Mail Code 2201A
                                            Washington, D.C.  20460
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-27-

1

2   Dated: _05 OCT 05_

3                              WAYNE NASTRI
                               Regional Administrator
4                              U.S. Environmental Protection
                                 Agency, Region 9
5                              San Francisco, CA

6   OF COUNSEL:

7   Jessica Kao
    Assistant Regional Counsel
8   U.S. Environmental Protection Agency, Region 9
    75 Hawthorne Street
9   San Francisco, CA  94105

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   FOR DEFENDANT SEVEN-UP/RC BOTTLING COMPANY OF SOUTHERN
    CALIFORNIA, INC.:

2

3

4   Dated: _Sept. 29, 2005_        _Will-M.9.r_

5                                  WILLIAM M. NELSON
                                   Senior Vice President and General Counsel
6                                  Seven-Up/RC Bottling Company
                                     of Southern California, Inc.
7                                  3220 E. 26th Street
                                   Vernon, California  90023

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              -29-

# APPENDIX A

## PH COMPLIANCE PLAN FOR SEVEN-UP/RC BOTTLING COMPANY OF SOUTHERN CALIFORNIA, BUENA PARK FACILITY

The pH compliance plan for Seven-Up/RC Bottling Company for Southern California, Inc. ("Seven-Up") shall comprise the following components and be implemented in accordance with the schedules set forth in the Consent Decree between the United States and Seven-Up under the Clean Water Act. Unless otherwise specified, any submission to the U.S. Environmental Protection Agency ("EPA") required under this Appendix shall be made as part of the quarterly report required under the Consent Decree.

1.      Wastewater Treatment System Corrective Measures

The Corrective Measures shall consist of: (i) construction, installation and start-up of a new (including otherwise significantly modified) pH treatment system; and (ii) implementation of necessary procedures to ensure the proper operation and maintenance of the new pH treatment system. The Corrective Measures are more specifically described in Attachment 1, inclusive of the diagrams entitled "Proposed Waste Treatment System Layout" and "Waste Treatment System Design Process & Instrumentation Diagram," and any EPA-approved replacement or modifications thereof.

Modifications to the pH treatment system may become necessary from time to time. A "minor modification" is a modification that does not in any way reduce or compromise the functionality and efficiency of the pH treatment system. A "major modification" is any modification that is not a "minor modification." For a minor modification, Seven-Up may proceed with it but must include documentation of the modification in Seven-Up's quarterly report EPA under the Consent Decree. For a major modification, Seven-Up must obtain EPA approval before proceeding with it.

2.      Wastewater Treatment System pH Monitoring Component

The Monitoring Component, more specifically described in Attachment 2, shall consist of: (i) daily pH logging, which shall include using a pH chart recorder or similar device to record daily pH sample results, and preparing daily tabulation of any pH sample results that fall within the pH ranges of 4.9 to 4.0, 3.9 to 3.0, 2.9 to 2.0, and 1.9 and below; (ii) daily supervisory review of pH data; (iii) periodic pH probe and equipment maintenance; and (iv) periodic management review of pH compliance and preparation of reports to EPA

3.      Wastewater Treatment System Training Component

The Training Component, more specifically described in Attachment 3, shall consist of: (i) an employee training program; (ii) an outside personnel orientation program; and (iii) a training/orientation log program.

# ATTACHMENT 1

## SEVEN-UP/RC BOTTLING COMPANY OF SOUTHERN CALIFORNIA WASTEWATER TREATMENT SYSTEM

Corrective measures consist of significant modifications to the treatment plant and operation and maintenance of the new system. Implementations of these corrective measures are described below.

### Process Description

Changes to the existing Seven-Up/RC Bottling Company of Southern California, Inc. (Seven-Up) wastewater treatment system to ensure consistent and continuous compliance are presented in the Waste Treatment Process & Instrumentation Diagram (P&ID). The drawing shows and describes the wastewater treatment processes and controls and the process sequence to provide the necessary treatment to consistently meet the pH limits, eliminate dry weather flows to the storm drain, and mitigate wet weather flows by capturing them for treatment and subsequent discharge to the sanitary sewer.

Minor modifications to the actual constructed facilities may be necessary based on actual field conditions, but the functionality and process efficiency of the system will not be reduced by any changes to the mechanical, structural, electrical or instrumentation components to meet field conditions. Any changes will be noted to the EPA and documented by submitting a set of record drawings.

### Wastewater Treatment System Operating and Maintenance

The new wastewater treatment system operation and maintenance requires additional training and staffing. Under normal conditions, the system pumps, control valves, chemical metering pumps, and mixer operate automatically. Operator intervention is needed for the following normal operations:

- Monitoring caustic feed tank level, ordering chemicals, and monitoring tank filling operations
- Cross-checking and recording the influent and effluent pH meter readings once per shift
- Changing pH and flow meter chart paper once per week
- Weekly pH meter calibration (outside contractor)
- Monthly pH meters maintenance and assessment (outside contractor)

Seven-Up personnel will also be needed for abnormal operation or emergency conditions when an alarm sounds, when there is an equipment malfunction, or when there is discrepancy between the pH meter and the cross-check pH meter. Standard mechanical and electrical equipment will be checked and maintained per the manufacturer's recommendations. The lift station has a 100 percent installed backup pump. Spare parts for other mechanical, electrical equipment, and instrumentation will be provided to minimize any down time and provide for consistent compliance.

The wastewater treatment system quality assurance (QA) centers around assuring proper pH meter function and calibration. As more specifically described in the section on continuous pH monitoring as part of the pH compliance plan and as described above, Seven-Up personnel monitor the operation of the wastewater treatment system and specifically cross-check the pH of the meter readings. The pH meter readings are cross-checked against an independent and laboratory-calibrated pH meter to check for significant differences. An operator check list is presented in the section on continuous pH monitoring and includes reporting alarms, potential violations, and abnormal conditions to the supervisor. A monthly report is also generated for management review. Any violations will be reported to the supervisor and management for immediate action including a report to USEPA and the Orange County Sanitation District (OCSD).

M:\Projects\201120 Seven-UP-RC\21'





# ATTACHMENT 2

## SEVEN-UP/RC BOTTLING COMPANY OF SOUTHERN CALIFORNIA WASTEWATER TREATMENT SYSTEM PH MONITORING COMPONENT

This attachment describes the pH monitoring program for Seven-Up/RC Bottling Company of Southern California, Inc. (Seven-Up). The purpose of the pH monitoring program is to ensure development and maintenance of a continuous pH monitoring system for compliance monitoring. The pH monitoring program consists of:

- The operator filling out a daily log sheet on a once per shift basis
- Supervisory review of the log on a daily basis and preparation of a monthly summary report
- Weekly pH probe maintenance by an outside contractor and monthly pH equipment condition assessment by an outside contractor
- Monthly management review of the report unless there is a near violation or violation

Once per shift, operator reviews wastewater treatment system operation according to the attached log sheet. The operator completes the log sheet in full, and notifies the supervisor in the event of a pH violation, alarm event, or abnormal condition. Abnormal conditions include, but are not limited to, differences between visual observations and instrument readings, differences between independent pH readings and instrument readings, if the diversion valve is open, or an alarm condition. Any abnormal condition is noted on the daily log sheet and a supervisor notified. The Seven-Up operator reviews the pH readings from the previous day and notes any near violations or actual violations. A near violation is defined as a pH reading less than 6.1, but greater than 6.0. It will be the employee's responsibility to note the near violation(s) and report the incidence to a supervisor.

In the event of an actual violation, pH reading less than 5.0 for purposes of complying with Federal requirements, the operator notes the violation(s) on the log sheet, confirms that the flow is diverted to the wastewater treatment area sump and immediately reports the incidence to a supervisor. It is the supervisor's responsibility to verify that the problem is properly solved and the discharge pH is in compliance, and report the violation to Seven-Up management for reporting to the U,S.EPA. The report shall include a daily tabulation of five-minute pH data for the following pH ranges: 4.9 to 4.0, 3.9 to 3.0, 2.9 to 2.0, and 1.9 and below. The supervisor is also responsible for preparing the monthly wastewater treatment system summary. The summary consists of the attached monthly report sheet, attachments from all outside contractor reports for the same time period, and recommendations for any equipment or operating procedure improvements. The monthly summary will be reviewed by the plant manager.

M:\Projects\201120.Seven-UP-RC\21712 Prelim Design N Reg Apprvls\EPA Submtls\Aug Submtl\Mntrng Prog Doc

## ATTACHMENT 3

## SEVEN-UP/RC BOTTLING COMPANY OF SOUTHERN CALIFORNIA
## WASTEWATER TREATMENT SYSTEM
## TRAINING COMPONENT

Employee Training and Documentation

Seven-Up/RC Bottling Company of Southern California, Inc. (Seven-Up) will ensure that all Seven-Up personnel will be trained to implement the appropriate waste management practices relevant to their positions. All training activities will be logged and a copy of the log, along with any updated training materials, will be included in the quarterly report to USEPA. The log will include the date of training, person responsible for conducting the training, a short description of the training, and the name of the employees/contractor employee receiving training. Training materials will include an operations and maintenance manual, checklists for various operations, and training records. Seven-Up personnel will receive an initial on-the-job training during new system start-up and formal training within the first two months of operations. Formal training will be videotaped and then used for refresher training. Annual refresher training will be given for personnel responsible for the wastewater treatment system operations. Any new Seven-Up employee with wastewater treatment system responsibilities will be required to watch the formal training video and then given a "hands-on" training session by their supervisor. At least two (2) employees per shift will have the appropriate waste management training. Annually, the wastewater treatment system operations and maintenance procedures will be reviewed and changes made as necessary to the operations and maintenance manual.

Outside Personnel Training and Documentation

Outside contracted personnel will be given a system orientation by Seven-Up personnel. The orientation will review the wastewater treatment system basic operations, recordation of pH meter calibrations and caustic tank filling procedures. The orientation will also instruct outside contracted personnel with the proper procedures to respond to an alarm condition. Outside personnel will be required to submit a verbal and written report prior to leaving the site. All contracted personnel must have permission and orientation prior to working on the system. An annual system orientation will be given to outside vendors to describe any significant changes in their procedures or any wastewater treatment system operations that may impact their activities. All orientation activities, including the date of the orientation, a short description of the orientation provided, and a list of personnel receiving the orientation, shall be recorded in an orientation log. A copy of the orientation log, along with any updated orientation materials, shall be included in the quarterly report to USEPA

M.\Projects\201120.Seven-UP-RC\21712.Prelim Design N Reg Apprvls\EPA Submals\Aug Submit\Train.Prog.Doc